UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BROTHERS TRADING CO., INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. _____ |
| JAMES D. HARRISON, | § § | **JURY TRIAL DEMANDED** |
| Defendant. | § § § | |

## ORIGINAL COMPLAINT

Plaintiff Brothers Trading Co., Inc. ("Brothers Trading"), for its Original Complaint (the "Complaint") against Defendant James D. Harrison ("Harrison"), respectfully states as follows:

### Introduction

1. This case arises from Harrison's breach of his fiduciary duty of loyalty to his former employer, Brothers Trading, and his unlawful use and disclosure of confidential, proprietary, and trade secret commercial information belonging and relating to Brothers Trading and one of Brothers Trading's customers.

2. As part of his employment at Brothers Trading, Harrison agreed, among other things, not to use, disclose, or otherwise misappropriate the confidential information of Brothers Trading and its customers.

3. During his employment at Brothers Trading, Harrison worked almost exclusively on site at a facility operated by one of Brothers Trading's customers (the "Customer"),

which is located in Houston, Texas.  Harrison operated a "trading platform" for the Customer, which involved monitoring the Customer's inventory and soliciting price quotes from wholesalers when the Customer needed additional product.  As a result, Harrison became intimately familiar with the Customer's confidential information.

4. Brothers Trading had purchased the rights to the Customer's account from another alternative supplier in late 2005.  Brothers Trading had since invested substantially in developing the Customer's account, as well as the systems, relationships, and processes essential to that account.  Because Harrison had been managing the Customer's account since the early 2000s, Harrison was well aware of these facts.

5. Harrison had access to and familiarity with Brothers Trading's confidential information, which, without limitation, included Brothers Trading's trading partners, purchase and sales history, product movement, pricing, and other confidential and proprietary information.  This is highly sensitive information, with independent economic value, that Brothers Trading takes reasonable efforts to keep secret.

6. In late January 2016, Harrison informed Brothers Trading that both he and the Customer "wanted to go in a different direction," and that both would no longer be with Brothers Trading within one week's time.  Both Harrison and the Customer declined to say why they were leaving Brothers Trading.

7. After Harrison's departure, Brothers Trading learned that he had accepted a job with one of Brothers Trading's direct competitors.  Brothers Trading also learned that the same competitor had retained the Customer's business, and that Harrison was managing the competitor's relationship with the Customer.


8. Upon information and belief, while Harrison was still a paid employee of Brothers Trading, he was negotiating with his soon-to-be employer and misappropriating Brothers Trading's confidential and proprietary information. At some point, Harrison either (1) asked the Customer to terminate its ten-plus year relationship with Brothers Trading or (2) knew that the Customer was considering making changes to its program previously run by Brothers Trading, and neglected to tell Brothers Trading, thus depriving Brothers Trading of the opportunity to try and retain the Customer. Instead, Harrison looked out for only his own interests, and not that of his then-current employer, Brothers Trading.

9. After Harrison's departure, Brothers Trading learned that, just before leaving, Harrison had downloaded a multi-year history of all transactions between Brothers Trading and the Customer.

10. Brothers Trading also learned that, after leaving Brothers Trading, Harrison disclosed to at least one other customer the method by which Brothers Trading determines its fee for operating trading platforms for its customers. This is highly sensitive information, with independent economic value, that Brothers Trading takes reasonable efforts to keep secret.

11. Harrison's actions constitute breaches of contract, breaches of the fiduciary duty of loyalty he owed to Brothers Trading, and a misappropriation of Brothers Trading's trade secrets.

**The Parties**

12. Brothers Trading is a corporation organized under the laws of the State of Ohio, with its principal place of business in Springboro, Ohio. Brothers Trading is registered to conduct business in the State of Texas. Brothers Trading has multiple corporate divisions that

operate under registered trade names, one of which is FMG - Food Marketing Group (the "FMG Division").

13. Upon information and belief, Harrison is a citizen of the State of Texas, residing at 4007 Crow Valley, Missouri City, Texas 77459. Harrison may be served with process at 4007 Crow Valley, Missouri City, Texas 77459.

## Jurisdiction and Venue

14. Harrison is a former employee of Brothers Trading, who worked in the FMG Division. During his employment at Brothers Trading, Harrison worked mainly at one of the Customer's facilities located in Harris County, Texas.

15. Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction over the claims in this Complaint because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

16. This Court has personal jurisdiction over the Defendant because Harrison resides and does business in the State of Texas.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1332, because Harrison resides in this District and because a substantial portion of the events giving rise to Brothers Trading's claims occurred in this District.

## The Facts

A. *The Nature of Brothers Trading's Business*

18. Established in 1978, Brothers Trading is one of the largest promotional or alternative secondary wholesalers of grocery, health and beauty care, and general merchandise products in the United States.

19. The core of Brothers Trading's business involves purchasing products when the goods are priced at a discount or promotion, and reselling them to accounts that are not offered

4

the discount or at times when the promotion has ended. Brothers Trading's accounts, including the Customer, are offered products at prices below the prices then being offered by the goods' manufacturers. In short, Brothers Trading's business is like arbitrage with the commodities being branded grocery, health and beauty care, and general merchandise products.

20. Brothers Trading's presence in the marketplace increases competition, improves overall market efficiency, and benefits retailers and consumers by providing access to lower priced goods. Brothers Trading's customers range from the nation's largest wholesale and self-distributing retail grocery, drugstore, and mass-merchandise chains, to small "mom and pop" grocery stores and drugstores.

21. In some instances, Brothers Trading assigns one or more employees to work on site at a customer's facility. These on-site employees assist the customer by monitoring its inventory and by operating a "trading platform" to fulfill the customer's purchasing needs. Under this system, the Brothers Trading employee, like Harrison, was to assist the Customer in purchasing and inventory management of goods at low prices. When the customer needs to purchase a particular product, the Brothers Trading employee operates a trading platform that solicits price quotes from many other promotional or secondary wholesalers—including Brothers Trading, and which facilitates all aspects of the transaction.

22. The customer's procurement staff then issues a purchase order to Brothers Trading, which buys the product from the wholesaler. The customer pays Brothers Trading, which, in turn, pays the delivering vendor. This process also reduces the customer's management and payment of multiple alternate source vendors. Customers and vendors have come to depend on Brothers Trading's system as an integral part of their business.

23. Brothers Trading's trading platforms help customers, like the Customer, buy products at competitive prices, and, further, it helps customers with the logistics of purchasing and delivery. In exchange Brothers Trading retains a portion of the purchase price as its fee (the "Service Fee"), which is paid by the delivering vendor. The Customer receives the products at a delivered price, and Brothers Trading and the delivering vendor cover all of the costs, including the vendor's delivery and handling costs, as well as the compensation and benefits of the Brothers Trading's employee who operates the trading platform—such as Harrison.

24. On occasion, the customer has surplus or excess inventory and the Brothers Trading system handles the outbound sale in an auction on behalf of the customer. Harrison's duties included managing this aspect of Brothers Trading's service.

B.  *Harrison's Employment with Brothers Trading*

25. In late 2005, Brothers Trading purchased select operations of another alternative supplier (the "Seller"). Specifically, Brothers Trading acquired certain trading platforms that were then being operated by the Seller. One of these trading platforms was being operated for the Customer. Brothers Trading paid the Seller consideration for, among other assets, the Customer account and the relationship that the Seller had invested in procuring and maintaining the Customer account.

26. At the time, Harrison worked as the Seller's Account Manager for the Customer. As such, he worked almost exclusively on site at the Customer's facility. In this role, he monitored the Customer's inventory, solicited product price quotes from alternative wholesalers, coordinated with the Customer's procurement staff to arrange payment and shipping terms, and addressed issues that arose from time to time.

27. After the acquisition was complete, on or about December 27, 2005, Harrison became an employee of Brothers Trading. Harrison continued to be the Account Manager for the Customer.

28. When he became a Brothers Trading employee, Harrison received a copy of Brothers Trading's Associate Handbook (the "Employee Handbook"). Harrison executed multiple forms to confirm his receipt and acknowledgement of the policies set forth in the Employee Handbook. Copies of Harrison's executed acknowledgment sheets are attached as Exhibit A. The Employee Handbook is not attached in full because it is voluminous and because it is already in Harrison's possession.

C.   *The Employee Handbook*

29. The Employee Handbook provides that "Associates shall not disclose at any time, either during or after the Associate's termination of employment with [Brothers Trading], any confidential information belonging to or relating to [Brothers Trading]'s business…."

30. Further, the Employee Handbook states that Brothers Trading "considers confidential information to include, but not be limited to, information concerning [Brothers Trading]'s suppliers, customers, products, procurement and sales practices, pricing, inventory movements and histories, transportation, business operations, Associates and finances…."

31. The Employee Handbook also provides that "Associates must not copy or remove any property, including equipment, supplies, business records, Company data, reports, customer or vendor information and data, purchasing and sales information or other written, printed or recorded . . . material of any kind, belonging to or in the possession of [Brothers Trading]."

32. With respect to Brothers Trading employees working on site at customer facilities, the Employee Handbook states that the "Associate shall not disclose or use at any time, either during or after the Associate's termination of employment with [Brothers Trading], any

7

confidential information belonging to or relating to [Brothers Trading] and/or the [c]ustomers' business to anyone outside [Brothers Trading]…."

33. Harrison signed a Handbook Acknowledgement Sheet, which reiterated, among other things, that he would not disclose any "information belonging to or relating to [Brothers Trading's] business to anyone outside of [Brothers Trading]."

34. Further, Harrison signed a sheet evidencing his receipt and acknowledgement of Brothers Trading's policies for associates working on site at customers' facilities.

D. *Harrison Abruptly Leaves Brothers Trading*

35. In late January 2016, Harrison called his immediate supervisor at Brothers Trading.

36. During that call, Harrison informed his supervisor that both he and the Customer "wanted to go a different direction." To this end, Harrison informed his supervisor that, within one week's time, both he and the Customer would no longer be working for or conducting business with Brothers Trading.

37. In response, Harrison's supervisor asked him whether the Customer was retaining a different company to operate a trading platform, and, if so, the identity of the company being retained. Harrison would not answer the question.

38. Harrison's supervisor also asked him to setup an in-person meeting with the Customer, at which Brothers Trading could pitch its services and identify the savings it had generated for the Customer in past years. This is a standard practice when Brothers Trading learns that a customer may be unsatisfied or is evaluating its options for other reasons, and part of Harrison's job responsibilities. Harrison declined to setup this meeting.

39. After Harrison declined to help, Brothers Trading arranged a telephone conference directly with the Customer. During that conference, the Customer said that it

8

"wanted to go in a different direction."  But the Customer would not state whether it planned to retain a different company to operate its trading platform.

40. The Customer also informed Brothers Trading that it would soon be reestablished as a vendor, but, to date, that has not happened.  To the best of Brothers Trading's knowledge, neither have most of the other vendors that sold to the Customer while Brothers Trading was operating its trading platform.

41. Harrison's last day at Brothers Trading was on January 28, 2016.

E.  *Harrison Takes Confidential Information and Joins a Direct Competitor*

42. While at Brothers Trading, Harrison had access to and familiarity with Brothers Trading's confidential and proprietary information, as well as its trade secrets.  This confidential and proprietary information included, but is not limited to, Brothers Trading's trading partners, purchase and sales history, product movement, pricing, customer and vendor relationships, trade terms, shipment terms, the system Brother's Trading uses to operate trading platforms for its customers, and the method by which Brothers Trading calculates the Service Fee it charges for operating customer trading platforms.  Brothers Trading has made an enormous investment in its proprietary systems, which is something Harrison knew or should have known.

43. In addition, Harrison periodically attended and participated in meetings with the company's leadership and upper management.  A number of confidential and sensitive topics were discussed during those meetings, including the company's sales and growth strategies.

44. After Harrison's departure, Brothers Trading investigated his recent usage of company e-mail and other systems.  During this investigation, Brothers Trading found that, shortly before leaving the company, Harrison downloaded a multi-year summary of all transactions involving the Customer.  Additionally, when Harrison returned his work computer,

Brothers Trading learned that virtually all of Harrison's electronic documents appeared to have been deleted.

45. This multi-year summary contained confidential information including, but not limited to, products bought, prices, quantities, vendor information, Customer confidential and proprietary information, shipping information, and calculation of Brothers Trading's Service Fee. This confidential information would be extremely valuable to one of Brothers Trading's competitors. Significantly, Brothers Trading has made an enormous investment in its systems and information.

46. After Harrison's departure, Brothers Trading learned that he had accepted a job at one of Brothers Trading's direct competitors, Mountain View Wholesale and Export ("Mountain View"). Like Brothers Trading, Mountain View is an alternative or secondary distributor of various products. Harrison's title at Mountain View is the Director of Retail Grocery, Texas. Though it is a direct competitor, Mountain View was also a long-time trading partner of Brothers Trading. But after it hired Harrison, Mountain View terminated its relationship with Brothers Trading.

47. Harrison did not tell Brothers Trading that he was accepting a job at a direct competitor before he left Brothers Trading. Rather, Brothers Trading learned of this fact through a posting on Mountain View's public website.

48. Upon information and belief, it has not been Mountain View's standard practice to operate trading platforms for its customers. But Mountain View has very recently claimed that it has developed a system for operating these trading platforms.

49. Upon information and belief, Harrison assisted Mountain View in establishing its own trading platform.

10

50. Upon information and belief, Harrison assisted Mountain View in obtaining the Customer as a client.

51. In doing so, upon information and belief, Harrison used, disclosed, or otherwise misappropriated the confidential and trade secret information of Brothers Trading and the Customer.

### Count One – Breach of Contract (Damages)

52. Brothers Trading incorporates by reference the allegations contained in paragraphs 1-51 above.

53. By executing the Employee Handbook, Harrison entered into a valid and legally enforceable non-disclosure agreement freely and without duress.

54. Harrison has committed multiple breaches of the terms of the Employee Handbook, including (1) downloading a multi-year summary of transactions with the Customer prior to leaving Brothers Trading; (2) using, disclosing, or otherwise misappropriating the confidential information of Brothers Trading and the Customer; and (3) disclosing Brothers Trading's method for calculating its Service Fee and other confidential pricing information.

55. These breaches have proximately caused irreparable harm, damage, and injury to Brothers Trading, including, but not limited to, a loss of the Customer's account and damage to Brothers Trading's relationships with other customers and the FMG Division vendor trading members.

56. As a direct and proximate result of Harrison's breach of the Employee Handbook, Brothers Trading has suffered past and future damages in an amount to be determined at trial, plus attorney's fees and costs, prejudgment interest, and post-judgment interest.

## Count Two – Breach of Contract (Injunctive Relief)

57. Brothers Trading incorporates by reference the allegations contained in paragraphs 1-56 above.

58. Harrison has breached and continues to breach the Employee Handbook.

59. Unless restrained and enjoined, Harrison will continue to cause harm, damage, and injury to Brothers Trading for which it has no adequate remedy at law.

60. Therefore, Brothers Trading prays that the Court issue a permanent injunction prohibiting Harrison from further using, disclosing, or otherwise misappropriating the confidential information or trade secrets of Brothers Trading or any of its customers.

## Count Three – Misappropriation of Trade Secrets and Brothers Trading's Confidential Information

61. Brothers Trading incorporates by reference the allegations contained in paragraphs 1-60 above.

62. While at Brothers Trading, Harrison had access to and familiarity with sensitive confidential and proprietary information, including, but not limited to, Brothers Trading's trading partners, purchase and sales history, product movement, pricing, customer and vendor relationships, trade terms, shipment terms, the system Brother's Trading uses to operate trading platforms for its customers, and the method by which Brothers Trading calculates the Service Fee it charges for operating customer trading platforms.

63. This information derives independent economic value from not being generally known because it would be extremely valuable to Brothers Trading's competitors. Brothers Trading has taken reasonable efforts to maintain the secrecy of this information.

64. As such, this information constitutes trade secrets pursuant to the Texas Uniform Trade Secrets Act (the "TUTSA"). *See* TEX. CIV. PRAC. & REM. CODE § 134A.001, *et seq.*

65. Harrison has willfully and maliciously misappropriated Brothers Trading's trade secrets by disclosing them to Mountain View and other entities.

66. As a direct and proximate result of Harrison's misappropriation of its trade secrets, Brothers Trading has suffered damages in an amount to be determined at trial, plus punitive damages and attorney's fees and costs pursuant to the TUTSA, plus prejudgment and post-judgment interest.

## Count Four – Breach of Duty of Loyalty

67. Brothers Trading incorporates by reference the allegations contained in paragraphs 1-66 above.

68. Until January 28, 2016, Harrison was an employee of Brothers Trading. His job responsibilities included being an onsite manager of the Customer for Brothers Trading.

69. As such, under applicable law, Harrison owed a fiduciary duty of loyalty to Brothers Trading, which required him to refrain from engaging in practices harmful to Brothers Trading or that served an interest opposite to Brothers Trading's.

70. This fiduciary duty of loyalty prohibited Harrison from competing and/or diverting customers, sales, or other business from Brothers Trading.

71. Upon information and belief, Harrison breached this fiduciary duty of loyalty owed to Brothers Trading by virtue of the fact that, while still an employee of Brothers Trading, he intentionally damaged Brothers Trading's relationship with the Customer, assisted Mountain View in obtaining the Customer and setting up its own trading platform, and downloaded a multi-year history of Brothers Trading's transactions with the Customer.

72. Harrison committed these breaches of his fiduciary duty knowingly, willfully, and maliciously.

73. As a direct and proximate result of Harrison's breach of his fiduciary duty of loyalty, Brothers Trading has suffered damages in an amount to be determined at trial, plus punitive damages, attorney's fees and costs, prejudgment interest, and post-judgment interest.

## **PRAYER FOR RELIEF**

THEREFORE, Plaintiff Brothers Trading requests that this Court issue a judgment as follows:

a) On Count One, award compensatory damages in favor of Brothers Trading and against Defendant Harrison in an amount to be determined at trial, plus attorney's fees and costs, prejudgment interest, and post-judgment interest;

b) On Count Two, issue an order permanently enjoining Defendant Harrison from any further use, disclosure, or misappropriation of the confidential information or trade secrets of Brothers Trading or any of its customers;

c) On Count Three, award compensatory damages in favor of Brothers Trading and against Defendant Harrison in an amount to be determined at trial, plus punitive damages and attorney's fees and costs pursuant to the TUTSA, as well as prejudgment and post-judgment interest;

d) On Count Four, award compensatory damages in favor of Brothers Trading and against Defendant Harrison in an amount to be determined at trial, plus punitive damages, attorney's fees, court costs, prejudgment interest, and post-judgment interest; and

e) Award Brothers Trading such other and further relief to which it may be entitled.

## **JURY DEMAND**

Plaintiff hereby requests a trial by jury on all issues raised in this Original Complaint.

Respectfully submitted,

/s/ Jason Cross
Jason Cross, *Attorney-in-Charge*
Texas State Bar No.  24045727
S.D. Bar No.  617020
FROST BROWN TODD LLC
100 Crescent Court, Suite 350
Dallas, Texas 75201
Tel.    (214) 545-3472
Fax.    (214) 545-3473
Email.  jcross@fbtlaw.com

*Attorney for Plaintiff Brothers Trading Co., Inc.*

0092146.0634102   4831-8092-2671v4